# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

COALITION FOR HUMANE IMMIGRANT RIGHTS,
2533 W. 3rd Street, Suite 101, Los Angeles, CA 90057;

MAKE THE ROAD NEW YORK, 301 Grove St.
Brooklyn, New York 11237;

J.G.R.,* care of American Civil Liberties Union, 125
Broad Street, New York, NY 10004;

L.H.F.R,* care of American Civil Liberties Union, 125
Broad Street, New York, NY 10004;

*Plaintiffs*,

v.

MARKWAYNE MULLIN, Secretary of the U.S.
Department of Homeland Security, in his official capacity,
245 Murray Lane, SW, Washington, DC 20528;

TODD LYONS, Acting Director of the U.S. Immigration
and Customs Enforcement, in his official capacity, 500
12th St., SW, Washington, DC 20536;

RODNEY S. SCOTT, Commissioner for U.S. Customs
and Border Protection, in his official capacity, 1300
Pennsylvania Avenue, NW, Washington, DC 20229;

*Defendants*

No.

**COMPLAINT**

*Plaintiffs proceeding under pseudonyms are indicated with an asterisk.

**INTRODUCTION**

1.     This case challenges Defendants' secretive elimination of bedrock safeguards from expedited removal procedures, which Defendants only recently announced publicly in separate litigation brought by Plaintiff Make the Road New York ("MRNY").

2.     Beginning in 1997, when the expedited removal system was first put into practice, immigration officials were required to advise all noncitizens of their right to seek protection from persecution and torture and to ask all noncitizens if they fear being removed. This requirement reflected the United States' *non-refoulement* treaty obligations not to remove noncitizens to countries where they could face persecution or torture.

3.     The 1997 rulemaking first adopting the expedited removal regulations made clear that officers conducting expedited removal inspections must both (1) "clearly advise[]" all noncitizens that the inspection interview "may be the only opportunity to present information concerning any fears or concerns about being removed from the United States"; and (2) specifically ask every noncitizen if they have "any fear or concern of being removed." 62 Fed. Reg. 10,312, 10,318-19, 10,355 (Mar. 6, 1997) (codified at 8 C.F.R. § 235.3(b)(2)(i)). The rulemaking further required that these advisal and questioning requirements be fulfilled using Forms I-867A and I-867B (collectively "Form I-867"). *See id.* at 10,318-19, 10,355 (codified at 8 C.F.R. § 235.3(b)(2)(i)); *see also* Exhibit A (Prior Form I-867). Plaintiffs hereafter refer to these aspects of the prior Form I-867 collectively as the "Fear Advisal and Questions."

4.     Courts have recognized the importance of these safeguards and invalidated prior attempts by the government to summarily remove or expel noncitizens without providing noncitizens notice and opportunity to seek protection. *E.g.*, *Las Americas Immigrant Advoc. Ctr. v. DHS*, 783 F. Supp. 3d 200, 224-27 (D.D.C. 2025), *appeal pending*, Case No. 25-5313 (D.C.

Cir., filed Aug. 28, 2025); *Innovation Law Lab v. Wolf*, 951 F.3d 1073, 1077-78, 1089-93 (9th Cir. 2020), *vacated as moot*, 5 F.4th 1099 (9th Cir. 2021).

5.      Yet in February 2025, the Trump administration adopted a Revised Form I-867 that eliminated the Fear Advisal and Questions. *See* Exhibit B (Revised Form I-867).

6.      Defendants adopted the Revised Form I-867 without any public notice or announcement at the time. Indeed, in this Court, for nearly a full year, Defendants made no mention of this critical change while defending the legality of expanding its authority to utilize expedited removal for new populations of noncitizens in separate suits brought by Plaintiff MRNY and Plaintiff Coalition for Humane Immigrant Rights ("CHIRLA"). *See Make the Rd. New York v. Noem*, 805 F. Supp. 3d 139 (D.D.C. 2025), *appeal pending*, D.C. Cir. No. 25-5320 ("*MRNY v Noem*"); *Coal. for Humane Immigrant Rts. v. Noem*, 805 F. Supp. 3d 48 (D.D.C. 2025), *appeal pending*, D.C. Cir. No. 25-5289 ("*CHIRLA v. Noem*"). It was not until January 29, 2026, that Defendants first announced—in a filing to the D.C. Circuit in the *MRNY v. Noem* appeal—that DHS had quietly adopted a revised version of the Form I-867 nearly a year earlier on February 11, 2025.

7.      The elimination of the Fear Advisal and Questions in the Revised Form I-867 means that Plaintiffs' members and other people at risk of expedited removal under Defendants' other aggressive policies face being summarily removed by low-level immigration officers without even being advised of their right to seek protection from persecution or torture and the importance of expressing fear of removal, and without ever being asked if they do fear any such harm if removed.

8.      Defendants have articulated no basis or reasoned explanation for the Revised Form I-867 eliminating the decades-old safeguards reflected in the Fear Advisal and Questions.

2

Moreover, Defendants failed to provide the required public notice, much less any opportunity for the public to comment, prior to this major substantive change to longstanding expedited removal procedures.

9.      The Revised Form I-867 is unlawful. Without relief from this Court, people with valid fear claims, living anywhere in this country, are at risk of being separated from their families and expelled from the country without understanding their rights to seek protection and without an adequate opportunity to do so—meaning that many will be removed to countries where they face persecution, torture, or death.

## JURISDICTION AND VENUE

1.      This case arises under the United States Constitution; the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 et seq.; the Paperwork Reduction Act, 44 U.S.C. § 3501 et seq.; the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101 et seq.; and the Convention Against Torture ("CAT"), the Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA"), Pub. L. No. 105-277, div. G, Title XXII, § 2242, 112 Stat. 2681, 2681-822 (1998) (codified as Note to 8 U.S.C. § 1231).

2.      The Court has jurisdiction under 8 U.S.C. § 1252(e)(3). Section 1252(e)(3) confers jurisdiction in this District over "[c]hallenges [to the] validity of the [expedited removal] system," including challenges to regulations and "written procedure[s]" implementing the expedited removal statute. The Court also has jurisdiction under 28 U.S.C. § 1331.

3.      Venue is proper in this District under 8 U.S.C. § 1252(e)(3)(A). Venue is also proper under 28 U.S.C. § 1391(e)(1) because a substantial part of the events or omissions giving rise to this action occurred in this District and Defendants are officers of the United States being sued in their official capacity and reside in the District.

**PARTIES**

4.      Plaintiff Coalition for Humane Immigrant Rights ("CHIRLA") is a nonprofit membership organization headquartered in Los Angeles, California, with ten offices throughout California and a national policy office in Washington, D.C. CHIRLA was founded in 1986, and it is the largest statewide immigrant rights organization in California, with approximately 52,356 active members. CHIRLA's membership is diverse, and includes U.S. citizens, non-U.S. citizens with lawful status, and non-U.S. citizens without lawful status. Its noncitizen members include both members who were paroled into the United States and members who entered the United States without inspection and who have been living in the country for more than two weeks—two groups the current administration is seeking to subject to expedited removal.

5.      Plaintiff Make the Road New York ("MRNY") is a nonprofit membership-based organization whose mission includes providing immigration assistance and legal services to members and community members. It has five offices in the New York area, located in Brooklyn, Queens, Staten Island, and in Suffolk and Westchester Counties. MRNY has over 28,000 members residing in New York City, Westchester County, and Long Island. Its members include noncitizens who are subject to expedited removal under the current administration's policies expanding expedited removal.

6.      Plaintiff J.G.R. is a Mexican citizen who crossed into the United States on or about March 16, 2026, to seek protection because he feared a drug cartel that had attacked and stabbed him would again harm or kill him. While in Defendants' custody, J.G.R. told DHS officers on at least two occasions that he wanted to seek protection. However, his requests were ignored and Defendants subjected him to expedited removal using the Revised Form I-867.

4

7. Plaintiff L.F.H.R. is a Mexican citizen who crossed into the United States on or about March 18 or 19, 2026, to seek protection after a drug cartel had burned down his business and threatened him. While in Defendants' custody, L.F.H.R. told DHS officers that he wanted to seek protection but his requests were ignored and Defendants subjected him to expedited removal using the Revised Form I-867.

8. Defendant Markwayne Mullin is sued in his official capacity as the Secretary of Homeland Security. In this capacity, he directs each of the component agencies within DHS, including U.S. Immigration and Customs Enforcement ("ICE") and U.S. Customs and Border Protection ("CBP"). In his official capacity, Defendant Mullin is responsible for the administration of the immigration laws, including the expedited removal statute, pursuant to 8 U.S.C. § 1103.

9. Defendant Todd Lyons is sued in his official capacity as the Senior Official Performing the Duties of the Director of ICE.

10. Defendant Rodney S. Scott is sued in his official capacity as the Commissioner for CBP.

## FACTS

### A. Expedited Removal

11. Prior to 1996, noncitizens generally were entitled to a full hearing in immigration court before they could be removed, whether they were seeking entry at the border or had already entered the country. They also were entitled to administrative appellate review before the Board of Immigration Appeals ("BIA") and judicial review in federal court.

12. Expedited removal was introduced by the 1996 Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA"). The Act generally retained preexisting procedures for

5

removal hearings for all noncitizens, entitling them to a full hearing in immigration court before they could be removed, administrative review by the BIA, and federal court review of an adverse administrative decision. 8 U.S.C. § 1229a; 8 U.S.C. § 1252(a) *et seq.* These regular removal proceedings (commonly referred to as "Section 240" proceedings) guarantee noncitizens a number of procedural rights, including the right to retain and be represented by counsel, the right to contest the factual and legal allegations against them, the right to apply for relief from removal, including asylum, and the right to terminate the proceedings or suppress evidence based on an unlawful arrest.

13. In contrast, IIRIRA created a highly truncated removal process called "expedited removal" for certain individuals coming to the United States who are inadmissible because they engaged in fraud or misrepresentation to procure admission or other immigration benefits, 8 U.S.C. § 1182(a)(6)(C), or they lack the requisite documents for admission, 8 U.S.C. § 1182(a)(7). *See* 8 U.S.C. § 1225(b)(1).

14. The expedited removal statute provides that the process begins—and often effectively concludes—with an inspection by an immigration officer. That officer must determine whether the individual has been continuously present in the United States for less than two years; is a noncitizen; and is inadmissible because he or she has engaged in certain kinds of fraud or lacks valid entry documents "at the time of . . . application for admission." *See* 8 U.S.C. § 1225(b)(1)(A)(i), (iii) (citing 8 U.S.C. § 1182(a)(6)(C), (a)(7)).

15. If an individual claims to be a U.S. citizen, to have been admitted as a lawful permanent resident or refugee, or to have been granted asylum (in which case the individual cannot be subject to expedited removal), then the individual is entitled to limited additional review. *See* 8 U.S.C. § 1225(b)(1)(C); 8 C.F.R. § 235.3(b)(5).

16.     Otherwise, if the officer concludes that the individual is inadmissible under an applicable ground, the officer "shall," with simply the concurrence of a supervisor, 8 C.F.R. § 235.3(b)(7), order the individual removed "without further hearing or review unless the alien indicates either an intention to apply for asylum . . . or a fear of persecution." 8 U.S.C. § 1225(b)(1)(A)(i).

17.     Immigration officers use the Form I-867 during this process. Between the time the original expedited removal regulations took effect in 1997 and February 11, 2025, the Form I-867 included the Fear Advisal and Questions to provide the basic safeguards of notice and require questioning aimed at identifying if any noncitizen in the expedited removal process has a fear of persecution, harm or torture if returned to their home country. *See* 62 Fed. Reg. at 10,312; Exhibit A (Prior Form I-867) (reflecting that the original version of the form was adopted on "4-1-97").

18.     For those who fear persecution or torture if they are removed, the expedited removal statute provides a limited but important additional screening. During the inspection process, if a noncitizen indicates an intention to apply for asylum or expresses fear of removal, the immigration officer must refer the person for a "credible fear" interview with an asylum officer to determine whether the person must be allowed to apply for asylum and related protection. 8 U.S.C. § 1225(b)(1)(A)(ii), (B); 8 C.F.R. § 235.3(b)(4); 8 C.F.R. § 208.30(d)-(e).

19.     To prevail at the credible fear interview, the applicant must show "a significant possibility, taking into account the credibility of the statements made by the alien in support of the alien's claim and such other facts as are known to the officer, that the alien could establish eligibility for asylum." 8 U.S.C. § 1225(b)(1)(B)(v).

20.     Applicants who satisfy the credible fear standard have their expedited removal orders cancelled by operation of law and are placed into Section 240 removal proceedings, where they have the opportunity to apply for asylum and other relief from removal, present and cross-examine evidence before an immigration judge, preserve objections, and appeal any adverse decision to the BIA and court of appeals. 8 C.F.R. § 208.30(f); *see also* 8 U.S.C. § 1225(b)(1)(B)(ii).

21.     Applicants who do not pass the credible fear interview may request review of the decision by an immigration judge, but do not receive a full hearing or any subsequent administrative appellate or judicial review. 8 U.S.C. § 1225(b)(1)(B)(iii)(II)-(III); *see also* 8 C.F.R. § 208.30(g)(1). During the inspection and credible fear stages of expedited removal, DHS generally detains the noncitizen. 8 C.F.R. §§ 235.3(b)(2)(iii), (b)(4)(ii).

22.     An expedited removal order comes with significant consequences beyond removal itself. Noncitizens who are issued expedited removal orders are subject to a five-year bar on admission to the United States unless they qualify for a discretionary waiver. 8 U.S.C. § 1182(a)(9)(A)(i); 8 C.F.R. § 212.2. Similarly, noncitizens issued expedited removal orders after having been found inadmissible based on misrepresentation are subject to a lifetime bar on admission to the United States unless they are granted a discretionary exception or waiver. 8 U.S.C. § 1182(a)(6)(C).

23.     Since it was created nearly three decades ago, and for most of its existence, federal immigration authorities applied expedited removal in limited circumstances: to noncitizens who are seeking admission at a port of entry, who have been apprehended near the border shortly after they entered the country, or who arrive in the United States by sea. Recently,

however, the Trump Administration significantly expanded the use of expedited removal. *See infra* at Part D.

**B.    The Fear Advisal and Questions Required in Expedited Removal Processing Under 8 CFR § 235.3 and the Form I-867 Beginning in 1997**

24.    Congress carefully specified procedures to ensure that noncitizens properly subject to expedited removal have a fair chance to raise claims for asylum or fear of persecution. Expedited removal guarantees that if a noncitizen indicates an intention to apply for asylum or a fear of persecution, the officer "shall" refer the noncitizen for an interview with an asylum officer. 8 U.S.C. § 1225(b)(1)(A)(ii).

25.    When Congress created the expedited removal system, it balanced its desire to facilitate "efficient removal" against "a second, equally important goal: ensuring that individuals with valid asylum claims are not returned to countries where they could face persecution." *Grace v. Barr*, 965 F.3d 883, 902 (D.C. Cir. 2020). Thus, Congress took care to safeguard access to asylum by ensuring that noncitizens were screened to determine whether they had a "credible fear" of returning to their country of origin. *Id.*

26.    The regulations issued to implement the expedited removal statute in 1997 thus took certain steps to enforce Congress's intention to protect against the removal of noncitizens to persecution and torture. Chief among these was the requirement that immigration officers conducting expedited removal inspections administer the Fear Advisal and Questions reflected in the Form I-867. Immigration officers conducting expedited removal inspections had to (1) advise all noncitizens of the availability of protection and the need to raise any fear of removal; and then (2) specifically ask all noncitizens if they feared removal.

27.    Since the introduction of expedited removal in 1997, the regulations have required that, "in every case in which the expedited removal provisions will be applied," the "immigration

9

officer shall read (or have read) to the [noncitizen] all information contained on Form I-867A" and "shall record the [noncitizen's] response to the questions contained on Form I-867B[.]" 8 C.F.R. § 235.3(b)(2)(i); 62 Fed. Reg. at 10,355-56.

28.     The preamble to the 1997 rulemaking specifically explained that the then-newly developed Form I-867 would require officers to both (1) "clearly advise[] the [noncitizen] that this may be the only opportunity to present information concerning any fears or concerns about being removed from the United States, and that any information concerning that fear will be heard confidentially by another officer"; and (2) ask "if the [noncitizen] has any fear or concern of being removed or of being sent home." 62 Fed. Reg. at 10,319-20.

29.     Accordingly, the longstanding version of the Form I-867A stated as follows:

I am an officer of the United States Department of Homeland Security. I am authorized to administer the immigration laws and to take sworn statements. I want to take your sworn statement regarding your application for admission to the United States. Before I take your statement, I also want to explain your rights, and the purpose and consequences of this interview.

You do not appear to be admissible or to have the required legal papers authorizing your admission to the United States. This may result in your being denied admission and immediately returned to your home country without a hearing. If a decision is made to refuse your admission into the United States, you may be immediately removed from this country, and if so, you may be barred from reentry for a period of 5 years or longer.

This may be your only opportunity to present information to me and the Department of Homeland Security to make a decision. It is very important that you tell me the truth. If you lie or give misinformation, you may be subject to criminal or civil penalties, or barred from receiving immigration benefits or relief now or in the future.

**Except as I will explain to you, you are not entitled to a hearing or review.**

> **U.S. Law provides protection to certain persons who face persecution, harm or torture upon return to their home country. If you fear or have a concern about being removed from the United States or about being sent home, you should tell me so during this interview because you may not have another chance.** You will have the opportunity to speak privately and confidentially to another officer about your fear or concern. That officer will determine if you should remain in the United States and not be removed because of that fear.

10

Until a decision is reached in your case, you will remain in the custody of the Department of Homeland Security. Any statement you make may be used against you in this or any subsequent administrative proceeding.

*See* Exhibit A (Prior Form I-867) (emphasis added).

30.     In accordance with the 1997 rulemaking, the companion Form I-867B previously contained four questions, the second and third of which specifically asked about fear of harm if removed:

> Q.  Why did you leave your home country or country of last residence?
> Q.  **Do you have any fear or concern about being returned to your home country or being removed from the United States?**
> Q.  **Would you be harmed if you are returned to your home country or country of last residence?**
> Q.  Do you have any questions or is there anything else you would like to add?

*See id.* (emphasis added).

**C.      Prior Administrations Attempted to Circumvent the Fear Advisal and Questions but Recognized that the Longstanding Regulations Required Them.**

31.     In the decades since the adoption of the expedited removal regulations and the Form I-867 in 1997, no previous administration—including the first Trump administration—ever suggested that DHS could circumvent the requirement to administer the Fear Advisal and Questions simply by eliminating them from the Form I-867, without revising the expedited removal regulations themselves.

32.     And when recent administrations have adopted policies seeking to summarily remove or expel noncitizens without similar notice and opportunity to raise fear claims, courts have repeatedly invalidated those policies.

33.     In January 2019, the first Trump administration adopted the so-called "Remain in Mexico" policy. The policy did not concern expedited removal but instead an assertion of authority for the treatment of asylum seekers placed in Section 240 removal proceedings. Under

11

the policy, DHS forcibly returned asylum seekers who had crossed the southern border back to Mexico to await immigration court hearings rather than allowing them to pursue their claims while in the United States. *Innovation Law Lab*, 951 F.3d at 1077. Unlike the longstanding requirement in expedited removal proceedings, DHS officers applying the Remain in Mexico policy were instructed not to ask noncitizens whether they feared being sent back to Mexico. *Id.* at 1078. Instead, only noncitizens who "affirmatively stated" that they feared being sent to Mexico could receive an assessment as to whether they might face persecution or torture there. *Id.* (cleaned up).

34.    The Ninth Circuit held that the Remain in Mexico policy violated the United States' statutory and treaty obligations not to remove or otherwise expel noncitizens to place where they might face persecution or torture. *Id.* at 1087-93. And the court specifically rejected as unsupported the government's speculation that noncitizens, "unprompted and untutored in the law of refoulement will volunteer that they fear returning to Mexico" without being asked. *Id.* at 1090; *see also Innovation Law Lab v. McAleenan*, 924 F.3d 503, 511 (9th Cir. 2019) (Watford, J., concurring) ("I'm at a loss to understand how an agency whose professed goal is to comply with *non-refoulement* principles could rationally decide not to ask that question").

35.    Indeed, DHS acknowledged during a subsequent rulemaking during the first Trump administration that although "[t]he regulatory text at 8 C.F.R. § 235.3(b)(2)(i)" refers to the information and questions on the Form I-867 without specifically reciting all the information and questions contained on the form, "the preamble to the regulation made clear that all [noncitizens] placed into expedited removal were to be questioned about a fear of return" after being advised of the importance of doing so. 85 Fed. Reg. 84,160, 84,179 (Dec. 23, 2020) (citing 62 Fed. Reg. at 10,319). That administration therefore reiterated DHS's "longstanding

12

practice . . . to ask every [noncitizen] subject to expedited removal about a potential fear of return." *Id.*

36.    Accordingly, when the Biden administration in 2024 sought to deviate from administering the Fear Advisal and Questions during periods that it deemed to present "emergency border circumstances," it did so through a rulemaking published in the Federal Register that created a new regulation, 8 C.F.R. § 235.15, to explicitly override 8 C.F.R. § 235.3(b)(2)(i) during such periods. *See* 89 Fed. Reg. 48,710, 48,739-40 (June 7, 2024); *id.* at 48,770-71; *see also* 89 Fed. Reg. 81,156 (Oct. 7, 2024) (final rule). Unlike the longstanding regulation at 8 C.F.R. § 235(b)(2)(i), the regulation created by the 2024 rule—which has since been vacated—did not provide for the use of the Form I-867 during the purported emergency periods when that regulation applied. *See* 8 C.F.R. 235.15.

37.    The preamble to the 2024 rule stated that "'rather than asking specific questions of every noncitizen encountered and processed for expedited removal to elicit whether the noncitizen may have a fear of persecution or an intent to apply for asylum,'" officers would instead "'refer a noncitizen for a credible fear interview only if the noncitizen manifests a fear of return'" without being asked. *Las Americas Immigrant Advoc. Ctr.*, 783 F. Supp. 3d at 224-25 (quoting 89 Fed. Reg. at 81,168); *accord* 8 C.F.R. 235.15(b)(4).

38.    Judge Contreras vacated that portion of the 2024 rule as arbitrary and capricious. *Las Americas Immigrant Advoc. Ctr.*, 783 F. Supp. 3d at 224-27. The Court explained: "The 1997 regulations displaced by the [r]ule required officials to provide individual advisals to each noncitizen, affirmatively ask questions designed to determine if the noncitizen qualifies for a credible fear interview, 'clearly advise[]' the noncitizen that he may have no other opportunity to 'present information concerning any fears or concerns about being removed,' and convey that

13

any information shared 'will be heard confidentially.'" *Id.* at 225 (brackets in original) (quoting 62 Fed. Reg. at 10,319). The Court concluded that the 2024 rule was arbitrary and capricious because, in the absence of the longstanding Fear Advisal and Questions, there were "virtually no guardrails to ensure consistency" in credible fear interview referrals. *Id.* at 226.

**D.      The Second Trump Administration's Aggressive Policies Expanding Expedited Removal Nationwide, Including to People Who Came Lawfully Via Parole**

39.      In the first days of the current administration, Defendants dramatically expanded the reach of expedited removal to individuals located anywhere in the country who cannot prove they have been continuously present in the United States for more than two years.

40.      On January 21, 2025, DHS issued a notice authorizing the expedited removal of certain noncitizens arrested anywhere in the country who cannot show "to the satisfaction of an immigration officer" that they have been continuously present in the United States for longer than two years. *See* U.S. Dep't of Homeland Sec., Notice Designating Aliens for Expedited Removal, 90 Fed. Reg. 8139 ("Designation").

41.      Under the Designation, noncitizens anywhere in the United States who have resided in the country are at risk of deportation without any hearing or meaningful review, regardless of their ties to the United States, or the availability of claims for relief from and defenses to removal. Even people who are not properly subject to expedited removal (for example, people who have been continuously present for more than two years) or to removal at all can be summarily removed if they are unable to affirmatively prove those facts to the satisfaction of an immigration officer.

42.      Meanwhile, the administration is also asserting the authority to apply expedited removal to noncitizens *regardless* of how long they have been in the United States if they had come into the country lawfully via grants of parole. *See CHIRLA v. Noem*, 805 F. Supp. 3d at 67-

14

70. Plaintiff CHIRLA and other organizations challenged those policies in a separate suit filed on March 24, 2025. *See id.* at 70.

E.        The *MRNY v. Noem* **Lawsuit Challenging the Designation**

43.        On January 22, 2025, MRNY filed the *MRNY v. Noem* suit challenging the Designation as unlawful. *See MRNY v. Noem*, 805 F. Supp. 3d at 154. It then filed an amended complaint adding individual plaintiffs and claims against guidance implementing the Designation and a motion to stay the Designation and implementing guidance under 5 U.S.C. § 705. *See id.* at 154-55.

44.        Throughout the course of that litigation up until January 29, 2026—before both the District Court and the Court of Appeals—Defendants repeatedly asserted that no relevant changes to expedited removal procedures had been made in decades. In their opposition to MRNY's § 705 motion, for example, Defendants represented that the procedures used under the challenged Designation "have been in place for nearly 27 years," and asserted that MRNY's due-process claim "challenges features of the procedures implementing expedited removal that have been in place since the statute's adoption decades ago." *See* Defs' Opp'n to Section 705 Mot. at 2, 18, ECF No. 56, *MRNY v. Noem*, Case No. 1:25-cv-00190-JMC (D.D.C. June 24, 2025).

45.        On August 29, 2025, the District Court granted a stay of the Designation and related guidance, concluding that Defendants likely violated the Due Process clause. *MRNY v. Noem*, 805 F. Supp. 3d at 147. The Court determined that there were "woefully inadequate procedures for accurately determining whether a noncitizen has been present for two years." *MRNY v. Noem*, 805 F. Supp. 3d at 166. The Court specifically contrasted this complete absence of screening procedures on the continuous presence issue with the procedures—under 8 C.F.R. § 235.3(b)(2)(i) and the Form I-867—intended to identify noncitizens with potential asylum-

15

related claims. *Id.* (citing 8 C.F.R. § 235.3(b)(2)(i) and quoting the prior version of the Form I-867). The Court separately concluded that the record showed that even the asylum-screening procedures in expedited removal were constitutionally inadequate as applied to noncitizens who have already entered the United States. *Id.* at 163-65.

46.    The government appealed the District Court's order and sought a stay pending appeal. Its stay motion to the D.C. Circuit once again led with the assertion that relevant "expedited-removal procedures . . . have been in place for decades." Appellants' Emergency Mot. for an Admin. Stay and a Stay Pending Appeal 1, Doc. No. 2133998, *MRNY v. Noem*, Case No. 25-5320 (D.C. Cir. Sept. 9, 2025).

47.    A D.C. Circuit motions panel largely denied the government's request for a stay pending appeal. *MRNY v. Noem*, No. 25-5320, 2025 WL 3563313 (D.C. Cir. Nov. 22, 2025). The panel majority concluded that the government was unlikely to show that there were constitutionally adequate procedures in place for determining whether noncitizens have been present in the United States for over two years or were otherwise eligible for expedited removal. *Id.* at *25-31 (Statement of Judges Millet & Childs). Like the District Court, the panel specifically contrasted the lack of any advisal about the relevance and importance of showing length of continuous presence with the asylum-related information contained on the prior version of the Form I-867A that it believed to be in effect. *Id.* at *26-27; *see also id.* at *12. The panel further contrasted the lack of any requirement that officers ask about continuous presence with the required questions about fear of removal on the prior version of the Form I-867B. *Id.* at *27.

48.    The panel then reasoned that the procedures for identifying asylum seekers— including specifically the Fear Advisal and Questions on the Form I-867—were likely constitutionally adequate. The panel therefore granted the government's stay motion only "to the

extent that the district court's order required any changes to [asylum screening] procedures." *Id.* at *1. On this point, the panel reasoned that, "[i]n stark contrast to the complete absence of any process regarding residency length," the asylum screening procedures reflected in the prior Form I-867 "involve immigration officers directly and specifically asking" noncitizens if "they 'have any fear or concern about being returned to [their] home country or being removed from the United States'; and if they would 'be harmed if [they] are returned to [their] home country or country of last residence[.]'" *Id.* at *29 (alterations in original) (quoting prior Form I-867B). The panel further explained that, "unlike the procedures' marked silence with respect to residency length," those "questions are asked only after the immigration officer informs an individual about the importance of coming forward with any 'fear' or 'concern about being removed from the United States or about being sent home' because the individual 'may not have another chance' to do so." *Id.* at *29-30 (quoting prior Form I-867A).

49.    In their opening brief on the merits in the D.C. Circuit, Defendants again led with the assertion that "DHS did not alter any aspect of the expedited-removal procedures that have been applied across Administrations." Appellants Br. at 1, Doc. No. 2141259, *MRNY v. Noem*, Case No. 25-5320 (D.C. Cir. Oct. 20, 2025); *see also, e.g.*, at 8 ("The procedures for expedited removal have been in place for decades.").

F.    **Defendants' Belated Announcement in the *MRNY v. Noem* Appeal of the Revised Form I-867 Eliminating the Fear Advisal and Questions**

50.    On January 29, 2026, Defendants filed a renewed motion for a stay pending appeal with the D.C. Circuit in *MRNY v. Noem*. They stated in a footnote to that filing that— nearly one year prior, on February 11, 2025—they had adopted a Revised Form I-867B that eliminated the required fear questions. *See* Appellants' Renewed Emergency Mot. for a Stay

Pending Appeal at 19-20 n.2, *MRNY v. Noem*, Doc. No. 2156587, Case No. 25-5320 (D.C. Cir. Jan. 29, 2026).

51. Defendants had made this change without any public notice or opportunity for public comment at the time. Indeed, the change was made so secretively that the filing indicated that it had only recently "come to [government] counsel's attention." *Id.* This was despite a year of intensive litigation concerning expedited removal procedures in *MRNY v. Noem* and other suits—and even though both the District Court and a D.C. Circuit motions panel had relied expressly on the Fear Advisal and Questions in the prior versions of the Form I-867.

52. On February 18, 2026, Defendants publicly acknowledged in a further filing in that same appeal that DHS on February 11, 2025, had also adopted a Revised Form I-867A that eliminated the protection-related advisals—even though the prior version of the Form I-867A too had been expressly relied upon in the earlier decisions in the case. *See* Appellants' Corrected Reply in Supp. of their Renewed Emergency Mot. for a Stay Pending Appeal 3 n.1 & Ex. A, Doc. No. 2159557, *MRNY v. Noem*, Case No. 25-5320 (D.C. Cir. Feb. 18, 2026).

53. Defendants adopted the Revised Form I-867 without compliance with notice and comment procedures, even though it abandoned safeguards adopted after notice and comment in the 1997 rulemaking. Nor does it appear that Defendants even issued either a Federal Register notice or any other public announcement concerning the change *after* it was made.

**G.      The Revised Form I-867 Without the Fear Advisal and Questions**

54. Defendants' revised Form I-867A eliminated the portions of the advisal concerning the availability of protection from persecution and torture, the importance of raising any fear of removal in the subsequent questioning, and the possible consequences of the

interview. The remaining advisal on the Form I-867A now states as follows (with deletions noted in strikethrough text):

> I am an officer of the United States Department of Homeland Security. I am authorized to administer the immigration laws and to take sworn statements. I want to take your sworn statement regarding your application for admission to the United States. ~~Before I take your statement, I also want to explain your rights, and the purpose and consequences of this interview~~.
>
> You do not appear to be admissible or to have the required legal papers authorizing your admission to the United States. ~~This may result in your being denied admission and immediately returned to your home country without a hearing~~. If a decision is made to refuse your admission into the United States, you may be immediately removed from this country, and if so, you may be barred from reentry for a period of 5 years or longer.
>
> This may be your only opportunity to present information to me and the Department of Homeland Security to make a decision. It is very important that you tell me the truth. If you lie or give misinformation, you may be subject to criminal or civil penalties, or barred from receiving immigration benefits or relief now or in the future.
>
> ~~Except as I will explain to you, you are not entitled to a hearing or review.~~
>
>> ~~U.S. Law provides protection to certain persons who face persecution, harm or torture upon return to their home country. If you fear or have a concern about being removed from the United States or about being sent home, you should tell me so during this interview because you may not have another chance. You will have the opportunity to speak privately and confidentially to another officer about your fear or concern. That officer will determine if you should remain in the United States and not be removed because of that fear.~~
>
> Until a decision is reached in your case, you will remain in the custody of the Department of Homeland Security. ~~Any statement you make may be used against you in this or any subsequent administrative proceeding.~~

*See* Ex. A (Prior Form I-867); Ex. B (Revised Form I-867).

55.    The statements deleted from the advisal in the Revised Form I-867A are the following: "Before I take your statement, I also want to explain your rights, and the purpose and consequences of this interview. . . . [Your apparent inadmissibility] may result in your being denied admission and immediately returned to your home country without a hearing. . . . Except as I will explain to you, you are not entitled to a hearing or review. U.S. Law provides protection

19

to certain persons who face persecution, harm or torture upon return to their home country. If you fear or have a concern about being removed from the United States or about being sent home, you should tell me so during this interview because you may not have another chance. You will have the opportunity to speak privately and confidentially to another officer about your fear or concern. That officer will determine if you should remain in the United States and not be removed because of that fear. . . . . Any statement you make may be used against you in this or any subsequent administrative proceeding." *See* Ex. A; Ex. B.

56.     The Revised Form I-867B eliminated both questions specifically asking noncitizens about fear of removal or risk of ham if removed. The revised form leaves only the following questions (with deletions noted in strikethrough):

Q.  Why did you leave your home country or country of last residence?
~~Q.  Do you have any fear or concern about being returned to your home country or being removed from the United States?~~
~~Q.  Would you be harmed if you are returned to your home country or country of last residence?~~
Q.  Do you have any questions or is there anything else you would like to add?

*See* Ex. A; Ex. B.

57.     The deleted questions asked: "Do you have any fear or concern about being returned to your home country or being removed from the United States?" and "Would you be harmed if you are returned to your home country or country of last residence?"

**H.      The Revised Form I-867 Will Cause the Wrongful Removal of Noncitizens to Persecution and Torture Without Even Receiving Credible Fear Interviews**

58.     Even during the decades between 1997 and last year when the government was in theory administering the Fear Advisal and Questions during expedited removal processing, there were consistent reports of immigration officers failing to comply with those requirements or

failing to refer noncitizens who did express fear of removal or the intent to seek protection to credible fear interviews.

59.     There is a significant risk of such erroneous non-referrals in part because "[t]he decision whether to refer an individual for a credible fear interview is made by an immigration officer, and that decision is not reviewable by anyone else." *MRNY v. Noem*, 805 F. Supp. 3d at 164 (citing 8 U.S.C. § 1225(b)(1)(A)(i)). "Entrusting the entirety of that decision making process to the executive branch official prosecuting the case leads, unsurprisingly, to problems." *Id.*

60.     The Court in *MRNY v. Noem* found that "this structural flaw has in fact played out in predictable ways, with inspecting officers 'regularly' recording 'false information' during expedited removal interviews, coercing individuals to sign interview forms including false information, or otherwise rushing individuals through a cursory process." *Id.* (citations omitted).

61.     A 2005 study commissioned by Congress documented numerous "serious problems" in the expedited removal process "which put some asylum seekers at risk of improper return." U.S. Comm'n on Int'l Religious Freedom, *Report on Asylum Seekers in Expedited Removal: Volume I: Findings & Recommendations* 4, 10 (2005), a*vailable at* https://perma.cc/4BBN-A9MZ ("2005 USCIRF Study"). *See also id*. at 53-54 (finding that in 15 percent of observed expedited removal cases, when a noncitizen expressed a fear of return to an immigration officer during the inspections process, the officer failed to refer the individual to an asylum officer for a credible fear interview).

62.     Other studies confirm the widespread failure of immigration enforcement officers to refer noncitizens who express a fear of persecution for interviews with asylum officers under the Prior Form I-867. *See* Human Rights Watch, *You Don't Have Rights Here* (2014), https://perma.cc/5B56-XWCL ("[S]ome said that US border officials ignored their expressions

of fear and removed them with no opportunity to have their claims examined; others said border officials acknowledged hearing their expressions of fear but pressured them to abandon their claims."); Borderland Immigration Council, *Discretion to Deny: Family Separation, Prolonged Detention, and Deterrence of Asylum Seekers at the Hands of Immigration Authorities Along the U.S.-Mexico Border* 12 (2017), https://perma.cc/4JBV-C6H6 ("CBP and Border Patrol officers in the El Paso Sector routinely and intentionally discourage people from seeking asylum. In 12% of the cases documented for this report, individuals expressing fear of violence upon return to their country of origin were not processed for credible fear screenings and instead, were placed into removal proceedings."); Letter from Nat'l Immigrant Justice Ctr. et al. to U.S. Dep't of Homeland Sec. Office of Civil Rights & Civil Liberties & Office of the Inspector Gen. at 12-22 (Nov. 13, 2014), https://perma.cc/6X2L-DLKZ (explaining that "[w]hen applicants express fears, CBP officials fail to capture those statements in the required documentation or include mistaken information," and providing numerous stories of asylum seekers affected by CBP's failures during the inspections stage of expedited removal).

63.     Defendants' adoption of the Revised I-867 eliminating the Fear Advisal and Questions severely exacerbates this pre-existing risk of erroneous non-referrals of asylum seekers to credible fear interviews. The revised form removes the critical modicum of safeguards and accountability provided by the Fear Advisal and Questions in the prior version of the form.

64.     Without the proper safeguards in the Fear Advisal and Questions, immigration officers will be less likely to elicit whether noncitizens fear removal. They will also be more likely to disregard or fail to record fear or protection claims by noncitizens who do make them. Moreover, in the absence of a requirement to ask and record any answer, there will be no record of such failures and no mechanism to correct the oversight.

65.    As discussed above, DHS has a long history of agents disregarding fear claims even when better safeguards were in place. Particularly with Defendants and the current administration as a whole pushing DHS officers for more and faster removals of noncitizens, the elimination of the safeguards provided by the Fear Advisal and Questions make it more likely that low-level immigration officers will quickly and unilaterally remove noncitizens without referring noncitizens who do fear removal and wish to seek protection to credible fear interviews. The result will be that significantly more asylum seekers or noncitizens with valid fear claims will be erroneously removed.

66.    In past contexts where the government has not been required to comply with baseline procedures for identifying potential asylum seekers like those reflected in the Fear Advisal and Questions, government data reflects that it has not effectively identified migrants with meritorious protection claims. When the Coast Guard has interdicted noncitizens at sea— where the government takes the position that the immigration regulations do not apply such that it need not use the Form I-867—the agency has recorded exceedingly and implausibly low rates of fear claims. For example, between 1981 and 1990, the Coast Guard interdicted 22,940 Haitians at sea but only 11 of them—less than 0.05 percent—were deemed to have expressed a fear that they "would be persecuted if returned to Haiti." Ruth Ellen Wasem, Cong. Rsch Serv., RS21349, *U.S. Immigration Policy on Haitian Migrants*, at 3 (Jan. 21, 2005), https://perma.cc/5CE5-UWYP. And "out of the 445 Haitians interdicted by the U.S. in FY 2013," "only one interdicted Haitian was given a credible fear interview"—an implausibly low "manifestation of fear" rate of well under 1 percent. *See* T. Alexander Aleinikoff, Yale Law School *Sale* Symposium: International Protection Challenges Occasioned by Maritime Movement of Asylum Seekers, Opinion Juris (Mar. 14, 2016), https://perma.cc/FS6K-8KUG.

More recently, from July 2021 to September 2023, the Coast Guard referred only 7 percent of the 27,000 migrants it interdicted in the Caribbean for credible fear interviews. *See* Seth Freed Wessler, When the Coast Guard Intercepts Unaccompanied Kids, ProPublica (Dec. 7, 2023), https://perma.cc/9ETA-YWVY.

67.    The impact was similarly disastrous under the government's pandemic-era "Title 42" policy in which it expelled asylum seekers at the southern border without the opportunity to seek protection. In March 2022, the D.C. Circuit held that the government could not apply the policy to expel noncitizen family units "to places where they face persecution or torture." *Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 722, 733 (D.C. Cir. 2022). In response to that decision, DHS adopted an approach like that previously used under the Remain in Mexico policy discussed above: families could in theory receive interviews concerning fears of persecution or torture if expelled, but only if they affirmatively "manifested" fear of expulsion without being asked by DHS officers. *See* Email from U.S. Border Patrol Acting Deputy of Operations Directorate Kenneth Blanchard to Border Patrol Field Chiefs & Field Deputies Re: Guidance Regarding Family Units Moving Forward Under Title 42 (May 21, 2022), https://perma.cc/Y7SY-4HHL.

68.    A survey of approximately 100 families expelled while that guidance was in effect between June and October 2022 found that "over half (51 families) reported that they had verbally expressed a fear of return," but that "CBP did not refer a single family for a fear screening." *See* Center for Gender & Refugee Studies, "Manifesting" Fear At the Border: Lessons from Title 42 Expulsions 2 (Jan. 30, 2024), https://perma.cc/3UHP-PU8V. Instead, the families surveyed reported that CBP officers instead "verbally abused them, telling them to 'shut

24

up,'" stated that the families "had 'no right' to an interview," or "completely ignor[ed] their attempts to communicate." *Id.*

69.    There were similarly disturbing but predictable results under the 2024 rule discussed above, which before it was vacated displaced 8 C.F.R. § 235.3(b)(2)(i) and its requirement that officers applying expedited removal administer the Prior Form I-867—and instead employed a similar requirement that noncitizens affirmatively "manifest" fear without being asked. Referrals for credible fear interviews fell by more than half in the first months the 2024 rule was in effect. *See* 89 Fed. Reg. at 81,159-60, 81,186, 81,240. And that rule's "manifestation of fear" requirement was held to be arbitrary and capricious because departing from the safeguards provided by the requirement to use the Form I-867 with the Fear Advisal and Questions predictably led to DHS officers arbitrarily and erroneously failing to refer asylum seekers to credible fear interviews. *See Las Americas Immigrant Advoc. Ctr.*, 783 F. Supp. 3d at 225-27. For example, one of the plaintiffs in that litigation was a woman who fled Colombia with her husband and son but DHS then separated her from them after they crossed the U.S. border together to seek asylum. *Id.* at 225-26. Despite repeatedly telling officers of "her fear of returning to Colombia," "she was ignored every time and was ultimately removed to Colombia without a credible fear interview." *Id.* at 226 (cleaned up). Meanwhile, her husband and son, who were detained separately but "whose claim[s] for asylum [were] *identical* to hers, [were] given credible fear interview[s] and remain[ed] in the United States awaiting an opportunity to seek protection." *Id.* (cleaned up).

70.    The Revised Form I-867 permanently eliminating the Fear Advisal and Questions likewise creates an intolerable risk that even those who know of their right to seek protection when placed into expedited removal will not be able to trigger the credible fear process. The

25

expedited removal process occurs quickly, in detention, and often without any opportunity to contact counsel or any third party—since the government takes the position that a limited right to such contact attaches only *after* a noncitizen is referred for a credible fear interview. Absent clear advisals of the right to seek protection and questioning about fear of removal, people are deprived of an adequate opportunity to raise claims for asylum, withholding of removal, and protection under the Convention Against Torture.

## I.      Harm to Plaintiffs

71.     The experiences of Plaintiffs J.G.R. and L.F.H.R. illustrate the lack of accountability for DHS officers and the dangers for asylum seekers in the expedited removal process under the Revised Form I-867. Both came to the United States to seek asylum and other protection. Defendants removed them pursuant to expedited removal in March 2026 using the Revised Form I-867 without referring any of them to credible fear interviews—even though both told DHS officers that they wanted to seek protection. As a result, they were removed and wrongly denied any opportunity to seek protection in the United States. They were removed to Mexico, the very country they originally fled, and where they continue to fear for their safety.

72. Both CHIRLA and MRNY have members subject to expedited removal without legally required minimal safeguards because of the Revised Form I-867. Due to the elimination of the Fear Advisal and Questions, even their members who have previously applied for asylum or intend to do so and would know and intend to raise their fears if arrested by DHS likely would be deprived of the opportunity to do so. And as with the Individual Plaintiffs—and has been the case in prior contexts where the government has not provided Fear Advisal and Questions—even members who *do* express their fears of removal are likely to have their expressions of fear

26

ignored by DHS officers due to the Revised Form I-867's elimination of the advisal and questions.

73. CHIRLA is a nonprofit organization dedicated to advancing the human and civil rights of immigrants and refugees and ensure immigrant communities are fully integrated into our society with full rights and access to resources. It is a membership-based organization with approximately 52,356 members across California, about 38,926 of whom reside in Los Angeles County. CHIRLA is funded, in part, by its members. The fee for an individual membership starts at $25, and families may become members for $60.

74. In furtherance of this mission, CHIRLA provides a range of services that reach tens of thousands of Californians each year. These services include education programs, legal services programs, and an assistance hotline that fields on average 15,000 calls a year. CHIRLA educates its membership as well as the broader community through know-your-rights trainings, workshops, and social media and educational literature about a variety of social services and benefits, including immigration law, financial literacy, workers' rights, and civic engagement.

75. CHIRLA members play an important role in deciding what CHIRLA's priorities are and how CHIRLA serves the community. CHIRLA receives feedback from its members during an annual member meeting and other member convenings where CHIRLA staff meet with members to discuss priorities for CHIRLA's work.

76. CHIRLA's membership is diverse, and includes U.S. citizens, non-U.S. citizens with lawful status, and non-U.S. citizens without lawful status. Many members belong to mixed-status families—that is, families consisting of both individuals with citizenship or lawful immigration status and individuals without. Most members are low-income.

27

77. CHIRLA's noncitizen members include both people who were paroled into the United States and members who entered the United States without inspection. Defendants are currently seeking to subject both those groups to expedited removal.

78. CHIRLA members live in areas where encounters with DHS officers and detention by DHS are common. DHS actively detains noncitizens all over California, including in and near Los Angeles.

79. CHIRLA has members who were previously granted parole upon arrival in the United States and who have been or are at risk of being placed in expedited removal proceedings under the Trump administration's current policies, at issue in *CHIRLA v. Noem*, by which the administration is asserting authority to apply expedited removal to parolees.

80. For example, CHIRLA member R.H.H. is an El Salvadoran national who was paroled into the United States at a port of entry along with her two minor children in November 2024. The family was placed in regular Section 240 removal proceeding in immigration court. On June 5, 2025, an immigration judge granted DHS's motion to dismiss those regular removal proceedings. DHS then arrested the family and issued them expedited removal orders. They were eventually released after more than a month of traumatic detention. However, they remain at imminent risk of being re-arrested and subjected to expedited removal. R.H.H. is pregnant and she fears that she and her children will be tortured or killed if removed.

81. CHIRLA member J.L. is a Venezuelan national who was paroled into the United States along with other members of her family at a port of entry in June 2024. She subsequently applied for asylum and her application remains pending. She fears that she will be persecuted or tortured by the Venezuelan government if removed.

28

82. CHIRLA member J.P. is a Haitian national who was paroled at a port of entry in December 2024 and placed in regular Section 240 removal proceedings, in which he filed an asylum application. In July 2025, an immigration judge granted DHS's motion to dismiss J.P.'s regular removal proceedings, whereupon DHS detained him. J.P. appealed the dismissal of his regular removal proceedings to the BIA and that appeal remains pending. J.P. is still in detention but he filed a pro se habeas corpus petition that was granted by the U.S. District Court for the Western District of Texas, and the immigration judge subsequently granted him bond, so he is expected to be released soon. He fears that if his administrative appeal concerning the dismissal of his Section 240 proceedings is not successful, he could be immediately subjected to expedited removal and removed from the country without the opportunity to seek protection.

83. Expedited removal of CHIRLA's members would be particularly harmful because of the rapid, summary nature of the process. It makes it more difficult for members and their families to have a plan in place; it causes more devastating, sudden family separation, which has a severe impact on any children involved; and the community around the members suffer as well.

84. In its educational materials and know-your-rights trainings, CHIRLA has been teaching its members about the risk of detention and deportation, including through expedited removal, and what they can do to prepare themselves and their families for the possibility of being placed in expedited removal proceedings.

85. However, the Revised Form I-867 eliminating the Fear Advisal and Questions significantly interferes with and frustrates this core work. By eliminating baseline safeguards that could provide some degree of consistency and accountability among DHS officers conducting expedited removal inspections, the Revised Form I-867 makes it much more likely that even CHIRLA members with fear claims who are prepared to state their fears of removal if arrested

29

by DHS will not be given the opportunity to do so, and much more likely that their expressions of fear will be ignored.

86. Defendants' secretive adoption of the Revised Form I-867 without any contemporaneous public acknowledgement or announcement also deprived CHIRLA of the ability to provide its members with accurate information about what to expect in the expedited removal process. It is essential that Defendants provide public notice of fundamental changes in expedited removal processing like those reflected in the Revised Form I-867 so that organizations like CHIRLA can provide accurate information to their members and communities.

87. CHIRLA and its members were also harmed by Defendants' adoption of the Revised Form I-867 without complying with the required notice-and-comment procedures because, if given the opportunity, CHIRLA would have submitted a comment to Defendants on their proposed change in policy.

88. CHIRLA submitted a comment concerning the 1997 expedited removal rulemaking. *See* Exhibit C ("CHIRLA Comment"). With respect to the expedited removal inspection process, CHIRLA's comment argued, among other things, that "[i]t is crucial that [immigration authorities] allow repeated opportunities within the inspection and pre-screening process for those who may fear persecution to make that fear known to the [immigration] officers, and that it provide a meaningful opportunity to apply for asylum." The comment further argued that the expedited removal "regulations should specify" that noncitizens "without proper documents will be given information about the asylum interview." The comment continued in part: "Such information should stress the importance of indicating to the immigration officer any fear of persecution or desire to apply for asylum. The information should be clearly communicated to

the [noncitizen] in a manner that the [noncitizen] will understand, in the [noncitizen]'s language."

89. These are precisely the concerns that led the government to adopt the Fear Advisal and Questions as required aspects of the Form I-867 in the 1997 rulemaking that created the expedited removal inspection regulation. *See* 62 Fed. Reg. At 10,318-19.

90. Had Defendants published notice of their intention to issue the Revised Form I-867 and eliminate the Fear Advisal and Questions and an opportunity for public comment, CHIRLA would have again commented to explain the danger of eliminating those essential safeguards.

91. MRNY is a nonprofit membership-based organization whose mission includes providing immigration assistance and legal services to members and community members. It integrates adult and youth education, legal and survival services, and community and civic engagement, in a holistic approach to help low-income New Yorkers improve their lives and neighborhoods. MRNY has five offices in the New York area, located in Brooklyn, Queens, Staten Island, and in Suffolk and Westchester Counties.

92. MRNY has over 28,000 members residing in New York City, Westchester County, and Long Island. Its members are overwhelmingly drawn from Spanish-speaking immigrant communities.

93. MRNY members include noncitizens who are subject to expedited removal under the Designation because they have not been admitted to the United States and who have been continuously present for between two weeks and two years.

94. MRNY's members also include noncitizens who are at risk of expedited removal under the Designation, even though they have been in the United States for longer than two years, because DHS lacks adequate procedures for preventing such noncitizens from being subjected to

31

expedited removal. *See MRNY v. Noem*, 2025 WL 3563313, at *25-29 (Statement of Judges Milett & Childs); *MRNY v. Noem*, 805 F. Supp. 3d at 154, 165-67 (D.D.C. 2025).

95. Its members also include noncitizens who are at risk of expedited removal because they were previously granted parole upon arrival in the United States.

96. For example, John Doe 4 is a member of MRNY and a noncitizen. He entered the United States without inspection in October 2023, and has been in the country since then. He is currently in removal proceedings. He filed a timely asylum application in September 2024.

97. John Doe 5 is a member of MRNY and a noncitizen. John Doe 5 was paroled into the United States in December of 2024. He was placed into Section 240 proceedings. But in June 2025, an Immigration Judge granted the government's motion to dismiss those proceedings. DHS detained him and issued an expedited removal order. He appealed the decision dismissing his Section 240 proceedings to the Board of Immigration Appeals and later secured his release from custody. He remains at risk of further processing in expedited removal.

98. The Trump administration has announced and exhibited an intent to concentrate immigration enforcement activity in jurisdictions like New York. ICE has detained a huge number of New Yorkers attending immigration court in Manhattan and reporting for other types of appointments and check-ins with ICE. The immigrant neighborhoods in and around New York City where MRNY has its offices and where many of its members reside have also been targeted for intensive immigration enforcement actions. These areas include Corona, Queens and surrounding neighborhoods; Bushwick, Brooklyn; Port Richmond, Staten Island; and Brentwood, New York. MRNY has assisted hundreds of people detained by ICE in and around New York City since February 2025, including dozens of people, almost all of them Latino, stopped in the neighborhoods and areas in which MRNY's offices are located and detained within moments.

MRNY members and their relatives have been among those stopped on the street and detained by immigration officers.

99. MRNY has members who could be subject to the Trump Administration's expanded expedited removal policies who are in removal proceedings. Prior to the District Court's August 29, 2025, decision in *MRNY v. Noem*, MRNY staff witnessed DHS filing motions to dismiss regular removal proceedings at the immigration courts where MRNY members' cases are docketed in order to place them in expedited removal proceedings pursuant to the Designation. *See MRNY v. Noem*, 805 F. Supp. 3d at 171 (D.D.C. 2025). Because the government was "dismissing section 240 proceedings as a predicate to placing people in expedited removal proceedings, the foreseeable next step is that some of these members will be put into expedited removal" if the Designation is once again allowed to take effect. *See id.*

100. MRNY and its members were also harmed by Defendants' adoption of the Revised Form I-867 without complying with the required notice-and-comment procedures. MRNY regularly provides comments in response to proposed changes of rules governing access to asylum and forms of protection. MRNY would have done so had Defendants published notice of their intention to issue the Revised Form I-867 and eliminate the Fear Advisal and Questions.

### FIRST CLAIM FOR RELIEF

### (Violation of the APA, 5 U.S.C. § 706(2)(A))

101. The APA provides that courts "shall . . . hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

102. The Revised Form I-867 is arbitrary and capricious because, among other reasons, Defendants failed to articulate reasoned explanations for their decisions; failed to consider

33

important aspects of the problem; considered factors that Congress did not intend them to consider; made unacknowledged, inadequately explained, and unjustified departures from prior agency policies and procedures; adopted procedures unreasonably ill-suited to complying with their *non-refoulement* obligations to prevent the removal of noncitizens to persecution or torture; and offered explanations and reached a conclusion counter to the evidence.

## SECOND CLAIM FOR RELIEF

### (Violation of the APA, 5 U.S.C. §§ 553 and 706(2)(A), (C), (D))

103.    The APA generally requires agencies to provide the public with notice of, and opportunity to comment on, legislative rules before their promulgation. 5 U.S.C. §§ 553(b), (c). The APA also requires that any substantive rule must generally be published at least 30 days prior to its effective date. *Id.* § 553(d).

104.    The Revised Form I-867 constitutes a legislative rule within the meaning of the APA.

105.    Defendants failed to comply with the APA's procedural requirements when adopting the Revised Form I-867.

106.    The Revised Form I-867 is therefore contrary to law and was issued "without observance of procedure required by law" under the APA, 5 U.S.C. § 706(2)(A), (C), (D).

## THIRD CLAIM FOR RELIEF

### (Violation of the Paperwork Reduction Act, 44 U.S.C. §§ 3506-3507, and the APA, 5 U.S.C § 706(2)(A), (C), (D))

107.    In addition to or in the alternative to their violation of the APA's procedural requirements, Defendants' issuance of the Revised Form I-867 also violated the procedural requirements of the Paperwork Reduction Act, 44 U.S.C. § 3501 *et seq.*

108.    The Paperwork Reduction Act requires agencies to publish proposed revisions to any "collection of information" in the Federal Register and permit the public to comment on any such revisions before they are adopted. 44 U.S.C. §§ 3506(c)(2)(A), 3507(a).

109.    The Revised Form I-867 constitutes a "collection of information" under the Paperwork Reduction Act.

110.    Defendants failed to comply with the Paperwork Reduction Act's requirements in issuing the Revised Form I-867.

111.    The Revised Form I-867 is therefore contrary to law and was issued "without observance of procedure required by law" under the APA, 5 U.S.C. § 706(2)(A), (C), (D).

**FOURTH CLAIM FOR RELIEF**

**(Violation of 8 C.F.R. § 235.3(b)(2)(i) and the APA, 5 U.S.C. § 706(2)(A))**

112.    "In every case in which the expedited removal provisions will be applied and before removing [a noncitizen] from the United States" via expedited removal, the expedited removal inspection regulation requires immigration officers to read to every noncitizen "all information contained on Form I-867A" and "record the [noncitizen]'s response to the questions contained on Form I-867B." 8 C.F.R. § 235.3(b)(2)(i).

113.    In order "to ensure that bona fide asylum claimants are given every opportunity to assert their claim," the rulemaking creating that regulation made clear that the advisal contained on the Form I-867A must "clearly advise[]" all noncitizens that the inspection interview "may be the only opportunity to present information concerning any fears or concerns about being removed from the United States, and that any information concerning that fear will be heard confidentially by another officer"; and that the questions on the Form I-867B would include

questions that specifically ask every noncitizen if they have "any fear or concern of being removed." 62 Fed. Reg. 10,312, 10,318-19 (Mar. 6, 1997).

114.    The Revised Form I-867 eliminates these required Fear Advisal and Questions.

115.    The Revised Form I-867 therefore violates the longstanding regulation and is arbitrary and capricious and contrary to law under the APA, 5 U.S.C. § 706(2)(A).

## FIFTH CLAIM FOR RELIEF

**(Violation of the INA, 8 U.S.C. § 1158(a)(1), 1225(b)(1), and 1231(b)(3), and their implementing regulations; FARRA, codified as Note to 8 U.S.C. § 1231, and its implementing regulations; and the APA, 5 U.S.C. § 706(2)(A), (C)).**

116.    The INA's asylum provision mandates that any noncitizen "who is physically present in the United States or who arrives in the United States . . . may apply for asylum in accordance with this section or, where applicable, [8 U.S.C. §] 1225(b)." 8 U.S.C. § 1158(a)(1).

117.    The INA's expedited removal statute, in turn, mandates that noncitizens cannot be subjected to expedited removal without credible fear interviews if they "indicate[] either an intention to apply for asylum under section 1158 . . . or a fear of persecution." 8 U.S.C. § 1225(b)(1)(A)(i)-(ii).

118.    The INA's withholding of removal provision bars removal of noncitizens to countries where it is more likely than not that they would face persecution. 8 U.S.C. § 1231(b)(3).

119.    FARRA prohibits removal of noncitizens to countries where it is more likely than not that they would be tortured. 8 U.S.C. § 1231 note; *see* 8 C.F.R. §§ 208.16(c)(2), 1208.16(c)(2).

120.    Properly interpreted, these statutory provisions and their implementing regulations all require that Defendants provide all noncitizens in expedited removal proceedings

36

adequate notice of their right to seek asylum and other protection from persecution and torture and the need to raise any fear of removal or desire to seek protection during the expedited removal inspection process; and that Defendants ask all such noncitizens if they fear removal.

121.    The Revised Form I-867 violates these statutory and regulatory requirements.

122.    The Revised Form I-867 is therefore contrary to law under the APA, 5 U.S.C. § 706(2)(A), (C).

## SIXTH CLAIM FOR RELIEF

### (Brought Only by Plaintiffs CHIRLA and MRNY)

### (Violation of the Due Process Clause of the Fifth Amendment to the U.S. Constitution)

123.    The Due Process Clause of the Fifth Amendment provides that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law."

124.    Plaintiffs' members who are at risk of being subjected to expedited removal are entitled under the Due Process Clause to meaningful notice of their right to seek protection from persecution and torture and the need to raise fears concerning removal during questioning, and a meaningful opportunity to raise those fears, before they can be removed from the United States.

125.    The Revised Form I-867 fails to provide adequate notice and opportunity to be heard in violation of the Due Process Clause.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully pray this Court to:

a.  Declare the Revised Form I-867 arbitrary and capricious, contrary to law, and issued without observance of procedures required by law;

b.  Vacate the Revised Form I-867 under the APA;

c.  Stay the effective date of the Revised Form I-867 under the APA;

37

d.   Preliminarily and permanently enjoin Defendants from employing the Revised Form I-867;

e.   Vacate the expedited removal orders issued to Plaintiffs J.G.R. and L.F.H.R.;

f.   Order Defendants to return Plaintiffs J.G.R. and L.F.H.R. to the United States, parole them into the country, and allow them the opportunity to seek asylum, withholding of removal, and protection under the Convention Against Torture;

g.   Award Plaintiffs' counsel reasonable attorneys' fees under the Equal Access to Justice Act and any other applicable statute or regulation; and

h.   Grant such further relief as the Court deems just, equitable, and appropriate.

Dated: March 30, 2026

Respectfully submitted,

*/s/ Cody Wofsy*
Cody Wofsy (D.D.C. Bar No. CA00103)

Anand Balakrishnan*
Sidra Mahfooz*
Grace Choi*
Omar C. Jadwat*
Lee Gelernt (D.D.C. Bar No. NY0408)
American Civil Liberties Union Foundation
Immigrants' Rights Project
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2660
abalakrishnan@aclu.org
smahfooz@aclu.org
gchoi@aclu.org
ojadwat@aclu.org
lgelernt@aclu.org

Michael K.T. Tan (D.D.C. Bar No. NY0636)
Morgan Russell*
Hannah Steinberg*
American Civil Liberties Union Foundation
Immigrants' Rights Project
425 California Street, Suite 700
San Francisco, CA 94104
(415) 343-0770
cwofsy@aclu.org
m.tan@aclu.org
mrussell@aclu.org
hsteinberg@aclu.org

Lucia Goin (D.D.C. Bar No. 1739389)
American Civil Liberties Union Foundation
Immigrants' Rights Project
915 15th Street NW, 7th Floor
Washington DC 20005
(212) 549-2660
lgoin@aclu.org

Arthur B. Spitzer (D.D.C. Bar No. 235960)
Aditi Shah (D.D.C. Bar No. 90033136)
American Civil Liberties Union Foundation of
the District of Columbia
529 14th Street, NW, Suite 722
Washington, D.C. 20045
(202) 457-0800
aspitzer@acludc.org
ashah@acludc.org

Attorneys for Plaintiffs
* *Pro hac vice application forthcoming*

39

# Exhibit A

**Appendix A**

U.S. Department of Justice

Immigration and Naturalization Service

# Record of Sworn Statement in Proceedings under Section 235(b)(1) of the Act

Statement by: _____

In the case of: _____

Date of Birth:_____          Gender (circle one):   Male   Female

At: _____          Date: _____

Before: _____
                                         (Name and Title)

In the _____ language.  Interpreter _____ Employed by_____

I am an officer of the United States Immigration and Naturalization Service.  I am authorized to administer the immigration laws and to take sworn statements.  I want to take your sworn statement regarding your application for admission to the United States.  Before I take your statement, I also want to explain your rights, and the purpose and consequences of this interview.

You do not appear to be admissible or to have the required legal papers authorizing your admission to the United States.  This may result in your being denied admission and immediately returned to your home country without a hearing.   If a decision is made to refuse your admission into the United States, you may be immediately removed from this country, and if so, you may be barred from reentry for a period of 5 years or longer.

This may be your only opportunity to present information to  me and the Immigration and Naturalization Service to make a decision.  It is very important that you tell me the truth.  If you lie or give misinformation, you may be subject to criminal or civil penalties, or barred from receiving immigration benefits or relief now or in the future.

Except as I will explain to you, you are not entitled to a hearing or review.

U.S. law provides protection to certain persons who face persecution, harm or torture upon return to their home country. If you fear or have a concern about being removed from the United States or about being sent home, you should tell me so during this interview because you may not have another chance.   You will have the opportunity to speak privately and confidentially to another officer about your fear or concern.  That officer will determine if you should remain  in the United States and not be removed because of that fear.

Until a decision is reached in your case, you will remain in the custody of the Immigration and Naturalization Service.

Any statement you make may be used against you in this or any subsequent administrative proceeding.

Q:   Do you understand what I've said to you?

A.

Q.    Do you have any questions?

A.

Q.    Are you willing to answer my questions at this time?

A.

Q.   Do you swear or affirm that all the statements you are about to make are true and complete?

A.

Page 1 of _____                                252                                I -867A (4-1-97)

**U.S. Department of Justice**

**Immigration and Naturalization Service**

**Jurat for Record of Sworn Statement in**
**Proceedings under Section 235(b)(1) of the Act**

Q:   Why did you leave your home country or country of last residence?

A.

Q.   Do you have any fear or concern about being returned to your home country or being removed from the United States?

A.

Q.   Would you be harmed if you are returned to your home country or country of last residence?

A.

Q.   Do you have any questions or is there anything else you would like to add?

A.

I have read (or have had read to me) this statement, consisting of _____ pages (including this page). I state that my answers are true and correct to the best of my knowledge and that this statement is a full, true and correct record of my interrogation on the date indicated by the above-named officer of the Immigration and Naturalization Service. I have initialed each page of this statement (and the corrections noted on page(s) _____).

Signature: _____

Sworn and subscribed to before me at _____
on _____.

_____
Officer, United States Immigration and Naturalization Service

Witnessed by: _____

Page _____ of _____

I-867B (4-1-97)

253

# Exhibit B

**Record of Sworn Statement in Proceedings under Section 235(b)(1) of the Act**

**U.S. Department of Homeland Security**

Office: _____   File No: _____

Statement by: _____

In the case of: _____

Date of Birth: _____   Gender (circle one):  Male   Female

At: _____   Date: _____

Before: _____
(Name and Title)

In the _____ language.  Interpreter _____ Employed by _____

I am an officer of the United States Department of Homeland Security.  I am authorized to administer the immigration laws and to take sworn statements.  I want to take your sworn statement regarding your application for admission to the United States.

You do not appear to be admissible or to have the required legal papers authorizing your admission to the United States. This may result in your being denied admission and immediately returned to your home country without a hearing.  If a decision is made to refuse your admission into the United States, you may be immediately removed from this country, and if so, you may be barred from reentry for a period of 5 years or longer.

This may be your only opportunity to present information to  me and the Department of Homeland Security to make a decision.  It is very important that you tell me the truth.  If you lie or give misinformation, you may be subject to criminal or civil penalties, or barred from receiving immigration benefits or relief now or in the future.

Until a decision is reached in your case, you will remain in the custody of the Department of Homeland Security.

Any statement you make may be used against you in this or any subsequent administrative proceeding.

Page 1 of _____

I-867A  (02/11/2025)

**Jurat for Record of Sworn Statement in Proceedings under Section 235(b)(1) of the Act**

**U.S. Department of Homeland Security**

Q:  Why did you leave your home country or country of last residence?

A.

Q.  Do you have any question or is there anything else you would like to add?

A.

I have read (or have had read to me) this statement, consisting of _____ pages (including this page).  I state that my answers are true and correct to the best of my knowledge and that this statement is a full, true and correct record of my interrogation on the date indicated by the above named officer of the Department of Homeland Security.  I have initialed each page of this statement (and the corrections noted on page(s)_____).

Signature: _____

Sworn and subscribed to before me at _____
on _____.

_____
Signature of Immigration Officer

Witnessed by:_____

I-867B  (02/11/2025)

# Exhibit C

# CHIRLA

Coalition for Humane Immigrant Rights of Los Angeles          1521 Wilshire Blvd. Los Angeles CA 90017

(213) 353-1333 • FAX (213) 353-1344





January 31, 1997

Director, Policy Directives and Instructions Branch
Immigration and Naturalization Service
425 I Street NW, Room 5307
Washington, D.C. 20536

RE:   INS NUMBER 1788-96
      COMMENTS TO PROPOSED RULE ON ILLEGAL IMMIGRATION REFORM AND
      IMMIGRANT RESPONSIBILITY ACT OF 1996

Dear Sir/Madam:
The Coalition of Humane Immigrant Rights of Los Angeles ("CHIRLA")
is a broad-based, multi-ethnic umbrella organization composed of
over one hundred voluntary, nonprofit, legal, religious, immigrant,
community, government, labor, academic, and business sectors
concerned with ensuring the fair and humane treatment of immigrants
and refugees.  Since its inception in 1986, CHIRLA has been the
leading advocacy group on immigration-related issues affecting the
greater Los Angeles area.

Attached please find comments to proposed rules on IIRAIRA.  These
comments were compiled by the American Immigration Law Foundation.

On behalf of its members, CHIRLA hereby declares its support of
these comments and urges their incorporation into the final
regulations.

Thank you for your consideration.

Sincerely,

Susan Alva, Attorney/Coordinator
Immigration and Citizenship Project

AA-REG-01279

# KEY CONCERNS TO PROPOSED RULE TO IIRIRA, # 1788-96

## COMMENTS REGARDING SUMMARY REMOVAL

**Information Given to Aliens Arriving Without Proper Documents**: The new law raises the stakes for those fearing persecution. Potential refugees arriving without documents will have to establish their fear in a very limited process. It is crucial that the Service allow repeated opportunities within the inspection and pre-screening process for those who may fear persecution to make that fear known to the INS officers, and that it provide a meaningful opportunity to apply for asylum.

The regulations should specify that arriving aliens without proper documents will be given information about the asylum interview. Such information should stress the importance of indicating to the immigration officer any fear of persecution or desire to apply for asylum. The information should be clearly communicated to the alien in a manner that the alien will understand, in the alien's language. The information should also explain the confidential nature of interviews with INS officials. The INS should also give to the alien information about volunteer services available to help arriving refugees during the expedited removal process, such as the names and telephone numbers of non-governmental organizations that provide pro bono services to refugees, including the United Nations High Commissioner for Refugees.

**The Pre-screening Interview**: Pre-screening interviews should be conducted only after arriving aliens are given time to rest, eat, and contact friends or family in the U.S., or organizations which may assist them. Pre-screening interviews should take place in private, comfortable rooms away from other airport activities. The regulations should require that aliens have access to interpreters before and during the pre-screening process. In order to facilitate review by a supervisory officer, pre-screening officers should keep records of all determinations of individuals who did not indicate a fear of being returned.

**"Credible Fear" Interviews**: The regulations should specify that an asylum officer will, before beginning the "credible fear" interview, again explain the importance and consequences of the process, the right of the alien to be represented at no expense to the United States government, and the right of the alien to contact friends, family, or human rights or refugee organizations to seek such representation. "Credible fear" interviews should be conducted, to the extent possible, at INS asylum offices or at detention facilities in or near major metropolitan areas. Access to counsel and other support systems, such as family, should be key determinants in selecting sites for the "credible fear" screening. The regulations should stipulate that interpretation should be provided by a live interpreter, unless it is impractical to locate and obtain the services of such an interpreter. In such a case, the alien should be given a reasonable period of time in which to locate and provide an interpreter.

**Asylum Officer Preparation**: In order to assess whether an alien's fear of return is credible, the regulations should require that asylum officers who conduct "credible fear" interviews have up-to-date information about country conditions around the world and that interviewers review this information before determining that an alien's fear is not credible.

**Standard of Proof**: Credibility determinations should take into account the fact that the alien has only been in the United States for a short period of time, has been in detention, and has not been able to collect the corroborating documentation often presented in initial asylum applications. The regulation should state that in expedited removal interviews, an asylum officer or immigration judge should apply a low screening standard to determine simply whether there is any significant possibility that the alien, given an opportunity to collect corroborating evidence and to present testimony and other evidence, might demonstrate eligibility for asylum or withholding of removal. In addition, an alien whose claim presents a novel question of law should be referred for a full hearing before an immigration judge for a determination of the novel issue.

**Record of Determination**: In order to assist the supervisory officer in determining whether the asylum officer conducting "credible fear" interviews is being sufficiently careful and thorough, the regulations should specify the format for a record of the asylum officer's determination. Such a record should include a thorough account of the

Comments re: 1788-96
page 2 of 4

alien's statement, any additional facts relied on by the officer, a description of the current conditions in the applicant's home country, any inconsistencies on which the officer relied to determine that the alien had no significant possibility of winning asylum, and a careful statement of the officer's analysis of why, in light of the facts, the order of removal should be entered. A copy of the record should be given to the alien against whom the order was entered.

**Review:** INS should presume that an alien who expresses fear of returning home after receiving a negative determination by an asylum officer would want to take advantage of an opportunity to appeal and should automatically refer the alien to a hearing before an Immigration judge. In the alternative, the regulations should require that the asylum officer or supervisor ask an alien receiving a negative determination if he or she would like to appeal that determination to an immigration judge. Review by the immigration judge should be in-person whenever possible.

**Citizens, Legal Residents, and Persons with Refugee or Asylee Status Attempting to Re-enter Without Proper Documents:** To protect against wrongful removal, the regulations should provide that aliens claiming to be citizens, lawful permanent residents, asylees, or refugees who are subject to expedited removal should be referred to a District Director or proceedings before an immigration judge. All arriving aliens should be permitted access to counsel and the right to challenge charges. The regulations should explicitly allow discretion when aliens allege citizenship or eligibility for certain benefits and, in those instances, refer the case either to a District Director or to an immigration judge under removal proceedings. The regulations should provide for a waiver of the document requirement for refugees and asylees returning to the U.S., just as there is a waiver provided for returning LPRs in certain circumstances.

**Applicability of Expedited Removal Procedures:** Though permitted by statute, the Attorney General should not apply expedited exclusion procedures to aliens other than those arriving at ports of entry. To include in the definition of "arriving alien" those who have entered without inspection and who have been in the U.S. for less than two years would be untenable. Such application would require prolonged factual determinations for each alien apprehended by INS as to whether the alien had been physically present in the U.S. for two years.

**Treatment of Minors:** Minors should be exempted from expedited removal proceedings in light of their particular needs and vulnerabilities.

**Detention of Aliens Who Establish a "Credible Fear":** Arriving aliens who establish a "credible fear" of persecution in an interview with an asylum officer should not be detained unless the government can demonstrate that the alien poses a danger to the community or a risk of flight. The final regulations should establish procedures to ensure prompt parole determinations for detainees who have passed the "credible fear" screening. Since the enactment of expedited exclusion obviates the need to detain asylum applicants in order to deter fraudulent claims, and since the detention of legitimate asylum seekers would be an inefficient and inappropriate use of scarce detention resources, the regulations should state that arriving aliens who establish "credible fear" are presumptively eligible for release.

## COMMENTS REGARDING ASYLUM

**Adjudication of the Exceptions to the One-year Deadline:** The regulations should require that in the case of an asylum application that appears to have been filed more than a year after the applicant entered the United States, a trained asylum officer will interview the applicant regarding the reasons for late filing, and will determine whether the applicant qualifies under one of the exceptions to the deadline.

- 2 -

AA-REG-01281

Comments re: 1788-96
page 3 of 4

**Definition of "Changed Circumstances"**: The definition of "changed circumstances," which would exempt a person from the requirement that he file for asylum within one year of entering the U.S., is too narrow. The regulation should broaden the definition to include those cases in which circumstances change materially just *before* the deadline expires; an applicant did not *become aware of* a change in human rights violations in the applicant's home country until more than one year after entry; and those in which the applicant genuinely belatedly discovers the existence of the one-year deadline.

**Definition of "Extraordinary Circumstances"**: The definition of "extraordinary circumstances," which would excuse a person from filing for asylum within one year of entering the U.S., should specify some types of circumstances that would clearly fall within this exception. A list of such circumstances would not resolve every case, but it would provide guidance to applicants, asylum officers, and immigration judges, avoid inconsistent decision-making, and avoid needless and costly litigation regarding circumstances that INS regards as covered.

**Denial of Asylum to Aliens Who Have Been Offered Resettlement Elsewhere**: The regulation would permit asylum officers and immigration judges to deny asylum applications if the applicant can be removed to a safe third country which has *offered resettlement*. This proposed regulation is inconsistent with the law, which provides for denials when an alien may be removed *pursuant to a bilateral or multilateral agreement* to a safe third country. This section of the regulation should be deleted.

## COMMENTS REGARDING VOLUNTARY DEPARTURE

**Attachment of Conditions**: Language in the regulation that the INS may attach to the granting of voluntary departure "any condition it deems necessary" should be deleted. Such language goes beyond the scope of the legislation.

**Duration of Voluntary Departure**: The regulation should not restrict the *total* number of days of voluntary departure to 120 days. The statute only requires that 120 days of voluntary departure be granted at any one time, but does not prevent giving multiple grants of voluntary departure that exceed 120 days.

**Revocation**: Revocation of voluntary departure should require notice and the opportunity to be heard.

**Restriction to Grant at Master Calendar Hearing**: The restriction that voluntary departure may only be requested at a master calendar hearing should be removed. At this stage, an alien (especially one without representation) may not be aware of this form of relief. Cases are often "settled" and voluntary departure is agreed to *after* the master calendar hearing.

**Pursuit of Other Forms of Relief**: The regulation's language restricting an alien from pursuing other forms of relief that may become available to him after receiving voluntary departure goes beyond the language of the statute and should be removed.

**Appeals**: The regulation denies aliens the opportunity to appeal a denial of voluntary departure while permitting the INS to appeal approvals. Both sides should be given the right to appeal, or both sides should be denied.

**Employment Authorization**: The language denying employment authorization should be removed as it goes beyond the scope of the legislation.

**Failure to Depart**: The regulation should provide an exemption for an alien who would otherwise have a deportation order issued against him for failing to depart when the alien, through no fault of his own, has not obtained travel documents. In cases where an alien who was previously granted voluntary departure and failed to

- 3 -

AA-REG-01282

Comments re: 1788-96
page 4 of 4

depart, the regulation correctly reflects the statutory language that such an alien is not eligible for voluntary departure. It fails, however, to include the statutory exception that the alien must have received notice of the penalty for failing to depart.

## COMMENTS REGARDING DETENTION

**Standards for Detention Facilities**: The regulations should require non-INS detention facilities to meet the American Correctional Association's standards for local detention facilities.

**Aliens Being Held Pending Removal Hearings**: Aliens without a criminal conviction being held in custody pending removal hearings should be presumptively eligible for release absent proof that they pose a threat to the community or are likely to flee. The burden to demonstrate a danger to the community or a risk of flight should be on the government.

**Detention revocation and review**: Revocation of release from detention should only occur if the INS demonstrates that the material conditions or circumstances which justified release have changed.

## OTHER COMMENTS

**Treatment of Juveniles**: We commend the INS for including the appointment of a *guardian ad litem* for all children. This is recognized as an effort to safeguard the best interests of children and assist in the prompt release of children to appropriate guardians.

**Cancellation of Removal**: The proposed regulation says that an application for cancellation of removal may only be filed with the Immigration Court after jurisdiction is vested by the INS filing a charging document with the Immigration Court. In practice, the INS does not file charging documents with the Immigration Court promptly. By not filing a Notice to Appear, the INS will effectively block a respondent's access to court and to obtain relief. The regulation should state that jurisdiction vests and proceedings commence when a charging document is filed with the Immigration court by the INS or by the respondent.

**Adjustment**: The regulations should refrain from limiting the availability of adjustment of status under section 245(i) to different classes of aliens, as such limitations are beyond the scope of the statute.

**Reinstatement of Removal Orders for Those Illegally Reentering**: The regulation should clarify that aliens believed to have entered the United States illegally after being subject to previous deportation, exclusion, or removal orders should receive a hearing before an immigration judge in order to avoid the costly error of a wrongful removal. The hearing is essential to minimize the risk of such an error by providing for the proper determination of issues such as: the identity of the individual; whether or not the individual complied with the previous order and remained outside of the U.S. for the requisite period of time; whether or not the person left under a grant of voluntary departure within the prescribed time limit; whether or not the person is a U.S. citizen; or whether the previous order was properly entered, among other issues.

**Notice to Appear (Form I-862)**: While the statute did not retain the requirement that the Notice to Appear be provided in Spanish, the INS is not required to remove the requirement. We recommend the regulations retain the requirement thereby maximizing the likelihood of respondents understanding and participating in INS proceedings.

- 4 -

AA-REG-01283